UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHELLE SHEEHAN, as Personal
Representative of the Estate of
WILLIAM SHEEHAN, SR., WILLIAM
SHEEHAN, JR., and JEREMY
GERARD KRASNY,

         Plaintiffs,

v.                                    Case No:  8:24-cv-00330-JLB-AAS

PROGRESSIVE AMERICAN
INSURANCE COMPANY,

         Defendant.

_____/

## <u>ORDER</u>

Plaintiffs in this Florida common-law bad faith action sue Defendant Progressive American Insurance Company ("Progressive") for failing to settle a bodily injury claim within policy limits, for, among other things, failing to advise its insured of a settlement offer.  (Doc. 1).  Progressive moves for summary judgment. (Doc. 30).  Plaintiffs responded (Doc. 40), and Progressive replied (Doc. 43).  After careful review of the parties' briefings and the record, the Court concludes that Progressive's Motion for Summary Judgment (Doc. 30) is due to be **DENIED**.

## BACKGROUND

On February 6, 2017, William Sheehan Sr. ("Sheehan Sr.") was driving a 2002 Chevrolet Silverado when he attempted to make a left-hand turn and collided with Jeremy Gerard Krasny ("Krasny"), who was riding on a motorcycle.  (Doc. 41 at

¶ 3).  Krasny suffered several broken bones and was transported to the hospital by ambulance.  (*Id.* at ¶ 5).  The Silverado that Sheehan Sr. drove belonged to his son, William Sheehan Jr. ("Sheehan Jr."), who was insured under Progressive Policy Number 80288450 ("the policy").  (*Id.* at ¶¶ 1, 3).  This policy included bodily injury coverage in the amount of $10,000 per person and $20,000 per occurrence.  (*Id.* at ¶ 2).

At some point after the accident, Krasny retained Czaia Law Firm ("Czaia Law") to represent him in a possible claim.  (*See id.* at ¶ 4).  On February 24, 2017, an employee of Czaia Law reported the accident to Progressive and faxed a letter of representation to Progressive on Krasny's behalf.  (*Id.* at ¶¶ 4, 6).  Pursuant to Florida Statutes § 627.4137, the letter requested that Progressive provide Czaia Law with information, including an affidavit that "there are no other applicable policies . . . that may provide coverage for the above-mentioned incident" and that "your insured . . . was not in the course and/or scope of any employment."  (Doc. 30-7 at 2) (emphasis omitted).  The letter was signed by the ostensible namesake of the firm, C.J. Czaia.  (*Id.*).  But the summary judgment record suggests that Mr. Czaia never spoke with a Progressive representative throughout the claim process.  (*See, e.g.*, Doc. 30-4).  In all events, Progressive contacted Sheehan Jr., who returned Progressive's call the next day to provide an updated phone number.  (Doc. 41 at ¶¶ 9–14).

On February 28, 2017, the bodily injury portion of the claim was referred to Progressive Adjuster Deborah Daley ("Daley").  (*Id.* at ¶ 15).  Daley noted from the

incident's police report that Krasny was speeding at the time of the accident, but she concluded that claim was still "valued up to the insured[']s policy limit." (*Id.* at ¶ 16).

Later that day, Daley spoke with Sheehan Jr. over the phone to learn more about the incident. (*Id.* at ¶ 17). Sheehan Jr. told her that Sheehan Sr. was his father, who lived with him. (*Id.*). Sheehan Jr. had given his father permission to drive the vehicle to run an errand. (*Id.*). Sheehan Sr. also owned an "old vehicle in the back yard that [was] not operable," but Sheehan Jr. did not believe that Sheehan Sr. had insurance coverage for that vehicle. (*Id.*). At the end of the call, Daley "explained the exposure" to Sheehan Jr. and advised him that an excess letter and Progressive's affidavit form would be forthcoming. (*Id.*).

On March 7, 2017, Progressive Claims Supervisor Jon Borsi ("Borsi") noted Progressive's receipt of the affidavit form that Czaia Law sent with its February 24 disclosure request, and Borsi requested that a response to the affidavit be issued "within 30 days or 3/24." (*Id.* at ¶ 18). Daley called Sheehan Jr. to advise him of the affidavit. (*Id.* at ¶ 19). Later that day, Daley called Czaia Law to clarify whether it would accept Progressive's form affidavit in response, as it was substantially similar to Czaia Law's form. (*See id.* at ¶ 24). Daley also noted in Progressive's files that Sheehan Sr. owned a 1956 Ford pickup that was "not drivable or insured since 2013," and she asked Borsi to confirm that no valid insurance existed for the pickup. (*Id.* at ¶¶ 20–21).

While Borsi investigated whether Sheehan Sr.'s 1956 Ford pickup was insured, Daley called Sheehan Jr., but was unable to reach him. (*Id.* at ¶ 22). Daley contacted Sheehan Sr., the father, by calling a different number, and Sheehan Sr. agreed to meet her to execute Progressive's form affidavit. (*Id.* at ¶ 23). Daley visited Sheehan Sr.'s home, where he completed an affidavit "stating that he had no other insurance besides the Progressive policy and was not in the course or scope of employment at the time of the accident." (*Id.* at ¶ 25). Daley notarized that affidavit. (*Id.*).

During Daley's conversation with Sheehan Sr., he told Daley that Sheehan Jr. was out of town, but Daley noted that Sheehan Sr. was evasive about when Sheehan Jr. would return. (*Id.* at ¶ 26). Daley "[t]ried to explain the importance of securing the [affidavit] as [a] condition of settlement and the probability of litigation if [they] did not provide [it]." (*Id.*). Daley also noted that Sheehan Sr. "said his son has an attitude etc. [and] he will talk with him but he is not actually responding to me[.]" (*Id.*). Daley concluded that she would continue to attempt to get an affidavit from Sheehan Jr., "even though he doesn't seem to think it[']s his problem." (*Id.*). During Daley's visit to the house, she gave Sheehan Sr. a letter that "informed the Sheehans of the applicable coverage, right to retain their own attorney, and requested them to advise Progressive if there was any other insurance coverage and to notify Progressive if a suit was filed." (*Id.* at ¶ 27).

Three days later, Borsi's search revealed that the Sheehan Sr.'s 1956 Ford pickup was covered by an active Essentia Insurance ("Essentia") policy. (*Id.* at

4

¶ 28).  Daley noted that this additional insurance coverage would need to be disclosed to Czaia Law.  (*Id.* at ¶ 30).  Accordingly, Daley called Sheehan Sr. on March 13 to tell him this, but Sheehan Sr. told Daley that he "wasn't willing to sign anything else."  (*Id.* at ¶¶ 30–31).  Daley left a message on Sheehan Jr.'s voicemail and reported the claim to Essentia.  (*Id.* at ¶¶ 29, 32).  On March 15, Essentia created a claim number and provided a phone number for Progressive to contact regarding the claim, but Essentia was unable to advise whether the 1956 Ford truck's insurance policy would cover the accident.  (*Id.* at ¶ 33).

The same day, Daley informed Czaia Law that Progressive was tendering its $10,000 bodily injury policy limits and that it would include additional release language "as there is another policy belonging to [Sheehan Sr.] that [] may have additional coverage."  (*Id.* at ¶ 35).

On March 16, 2017, Essentia informed Daley that no coverage was available under Sheehan Sr.'s policy because it was an antique vehicle policy.  (*Id.* at ¶ 37).  On March 17, Daley called Czaia Law and left a message for Czaia, stating that she wished to discuss the "issue at hand."  (*Id.* at ¶ 39).  She attempted to contact Czaia Law again on March 22.  (*Id.* ¶ 40).  Daley noted that if Czaia Law did not return her call, Progressive would send a package explaining its actions regarding the affidavit, because Sheehan Sr. refused to sign a second affidavit and Sheehan Jr. was unresponsive.  (*Id.*).  Separately, Borsi noted Sheehan Sr.'s unwillingness to sign a second affidavit and Sheehan Jr.'s unresponsiveness.  (*Id.* at ¶ 41).  Borsi

concluded that hiring defense counsel for the Sheehans might be necessary if Czaia Law would not waive its affidavit request.  (*Id.*).

Later that day, Daley spoke with a staff member at Czaia Law to explain the situation.  (*Id.* at ¶ 42).  She told the Czaia Law staff member that Progressive had found additional insurance and that Sheehan Sr. was retired and did not work. (*Id.*).  Daley also informed the staff member that she was "not able to get an affidavit from the insured."  (*Id.*).  The staff member told her "it was okay to send the disclosure and list the other carrier."  (*Id.*).

Progressive alleges that Czaia Law waived its request for an affidavit (Docs. 30-4 at PRG 0014 3/23/2017 3:10 PM ET, 30-11 at 35:4–14), but Plaintiffs deny this (Doc. 40 at ¶¶ 11–13), as only Mr. Czaia was authorized to waive affidavit requests (*See, e.g.,* Doc. 32-3 at 52:24–53:21).  But again, Mr. Czaia seemed to be unavailable to take or return Progressive's phone calls.  (*See* Doc. 30-4).  Ultimately, Daley's final liability decision concluded that Sheehan Sr. was 80% liable and Krasny was 20% liable for the accident. (Doc. 41 at ¶ 43).

On March 23, 2017, Daley sent a tender package to Czaia Law.  (*Id.* at ¶ 44). The package included a cover letter advising of the applicable coverage under the policy, disclosing the existence of the Essentia policy, and tendering Progressive's bodily injury policy limits in exchange for a proposed release.  (*Id.*).  Sheehan Sr. and Sheehan Jr. were copied on the letter.  (*Id.*).  The act of Progressive issuing the policy limits check "closed" the bodily injury feature of the claim within Progressive's software system.  (Doc. 30-6 at 159:1–7).

6

A month later, on April 24, 2017, Czaia Law represents that it faxed *and* mailed a demand letter to Progressive, but Progressive claims it has no record of receiving this letter. (Doc. 41 at ¶ 45). There remains a factual dispute between the parties as to whether Progressive ever received this demand letter from Czaia Law. The summary judgment record contains a fax confirmation sheet (Doc. 30-12), but Czaia Law has no proof of mailing this demand letter. (*See, e.g.*, Doc. 32-3 at 48:7–13). In all events, the letter stated that Krasny would be amenable to settlement if, within thirty days, the Sheehans provided affidavits stating their financial assets, that they were not in the course or scope of employment at the time of the accident, and that no other applicable insurance policies existed. (Doc. 41 at ¶ 45; Doc. 30-13).

Over the following months, Daley continued to communicate with Czaia Law. (Doc. 41 at ¶¶ 46–51). In April, she called about settling the property damage claim. (*Id.* at ¶ 46). In May, she called Czaia Law about "[the property damage claim] and release." (*Id.* at ¶ 47). In July, she notated Progressive's claims log stating, "pending [bodily injury], called attorney and left message." (*Id.* at ¶ 49). In August, she called Czaia Law twice and requested that Mr. Czaia return her call "on status of the 'release.'" (*Id.* at ¶ 50). Progressive claims it received no return calls from Czaia Law. (Doc. 30 at 7, 10–11).

On August 31, 2017, Daley called Czaia Law to discuss the release, but a Czaia Law employee told her to instead call HD Law Partners ("HD Law") because the claim had been referred to attorney Raymond Haas of HD Law. (Doc. 41 at ¶

7

51; Doc. 30 at 11; Doc. 30-4 at PRG0018 8/31/2017 3:50 PM ET).  When Daley called HD Law, she spoke with a new employee, who told Daley that she would look into the issue.  (Doc. 41 at ¶ 52).  On October 18, 2017, Daley spoke with attorney Raymond Haas of HD Law over the phone.  (Doc. 30-4 at PRG0018 10/18/2017 3:38 PM ET).  Daley noted that "he just wants copies of what the prior attorney who handled the claim for claimant advised we proactively tendered but we never [received the] release back and that the draft is pending."  (*Id.*).  Progressive's file notes do not indicate that Progressive ever sent HD Law the copies, and its notes do not indicate any further contact between Progressive and HD Law until litigation began.  (*See* Doc. 30-4 at PRG0018–19).  But there does not appear to be any dispute that HD Law never sent Progressive any letter indicating that it was representing the Sheehans in the claim.  (*See id.*).

Fast forward to March 9, 2018, when Sheehan Jr. informed Progressive that Krasny had sued him in November 2017 and that Sheehan Jr. had hired counsel to represent him and his father.  (Doc. 41 at ¶ 53).  Progressive subsequently retained counsel to represent the Sheehans.  (*Id.* at ¶ 54).  Ultimately, an Agreed Final Judgment for $750,000 was entered on November 9, 2022, against Sheehan Jr. and the estate of Sheehan Sr., who passed away during the litigation.  (*Id.* at ¶ 55).  Krasny, Sheehan Jr., and the personal representative of Sheehan Sr.'s estate then brought this lawsuit against Progressive.  (*See* Doc. 1).  Progressive moves for summary judgment (Doc. 30), Plaintiffs responded (Doc. 40), and Progressive

8

replied (Doc. 43). This is a very close call. But the Court denies Progressive's motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute as to any material fact exists, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving parties fail "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When that burden is met, the burden shifts to the nonmovants to demonstrate a genuine issue of material fact that precludes summary judgment. *Id.* The nonmoving parties must "go beyond the pleadings and . . . [their] own affidavits" and point to record evidence demonstrating a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. The Court reviews all the record evidence and draws all legitimate inferences in the nonmoving parties' favor. *Cleveland v.*

*Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004).

## DISCUSSION

Florida law "imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds the limits of the insured's policy." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 3 (Fla. 2018). This duty of good faith arises from the control that the insured cedes to the insurer over the litigation of the claim. *Id.* at 6. To satisfy its duty, the insurer must "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* Consequently, the insurer is obligated:

> to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (internal citations omitted).

These obligations "are not a mere checklist." *Harvey*, 259 So. 3d at 7. Instead, "the critical inquiry . . . is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* This is determined based on the totality of the circumstances, and the focus is "not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004) (citations omitted). However, while

10

an insurer's negligent actions may indicate the existence of bad faith, evidence of negligence alone cannot prevent summary judgment. *Martinez v. GEICO Cas. Ins. Co.*, 152 F.4th 1323, 1332 (11th Cir. 2025) (collecting cases).

In some cases, "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991) (citations omitted). In that scenario, "the financial exposure to the insured acts as a 'ticking financial time bomb' and '[a]ny delay in making an offer . . . even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith.'" *Kinsale Ins. Co. v. Pride of St. Lucie Lodge 1189, Inc.*, 1135 F.4th 961, 969 (11th Cir. 2025) (alterations in original) (quoting *Goheagan v. Am. Vehicle Ins. Co.*, 107 So. 3d 433, 439 (Fla 4th DCA 2012)). However, even once the insurer tenders the policy limits, its obligations do not end. *Harvey,* 259 So. 3d at 10. Instead, "the insurer's duty to act in good faith 'in handling the defense of claims against its insured' continues through the duration of the claims process." *Id.* (quoting *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785).

Here, summary judgment in favor of Progressive is denied because a reasonable jury could conclude that Progressive had a realistic opportunity to settle Krasny's claim and yet it acted in bad faith by failing to advise the Sheehans of a potential settlement opportunity, failing to provide Krasny with information that he

11

needed to settle, and by failing to exercise reasonable care and diligence in its settlement negotiations.  Each of these issues will be addressed in turn.

## I.   Progressive Had a Realistic Opportunity to Settle Krasny's Claim.

First, Progressive argues it is entitled to judgment as a matter of law because it never had a realistic opportunity to settle Krasny's claim.  (Doc. 30 at 21–25).

Generally, Progressive is correct that summary judgment is proper where an insurer can show "not only that there was no realistic possibility of settlement within policy limits, but *also* that the insured was without the ability to contribute to whatever settlement figure that the parties could have reached." *Powell*, 584 So. 2d at 14 (emphasis added).  It is exceedingly difficult for an insurer to satisfy this burden because "[a]ny question about the possible outcome of a settlement effort should be resolved in favor of the insured." *Id.*

Here, summary judgment is not appropriate because, as discussed in the following sections of this Order, a reasonable jury could conclude that Progressive did not act in good faith under the totality of the circumstances.

## II.   Progressive's Failure to Inform the Sheehans of the Settlement Opportunity Presented by Czaia Law's April 24 Demand Letter.

A reasonable jury could conclude that Progressive demonstrated bad faith by failing to advise the Sheehans of the settlement opportunity presented by Czaia Law's April 24 demand letter because Florida law obligated Progressive "to advise the [Sheehans] of settlement opportunities" and "give fair consideration to a settlement offer that [was] not unreasonable under the facts." *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785.

Progressive argues that this issue does not prevent the Court from granting summary judgment because Progressive has no record of ever receiving the demand letter, Czaia Law never communicated the letter to Progressive by any other means, and the letter did not constitute a true settlement offer. (Doc. 30 at 21–25).

The Court finds that these questions are best left for a jury to ferret out. Addressing Progressive's arguments individually, the Court must assume at this stage that Progressive received Czaia Law's demand letter because the record is genuinely disputed concerning this fact, and the Court must view all facts in the light most favorable to Plaintiffs. (*See* Docs. 30-12, 30-13, 30-14); *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1348 (11th Cir. 2023). Because Plaintiffs have provided evidence that the demand letter was properly delivered via fax on April 26 (Doc. 30-12), it remains for a jury to determine whether Progressive ever received it. The role of the Court at summary judgment is not to weigh evidence. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Next, Progressive's argument that Czaia Law failed to mention the letter to Progressive is similarly unavailing because Florida law demands that the focus in a bad faith claim must remain on the insured's actions, not those of the claimant. *Ilias*, 61 F.4th at 1346. A jury may factor in other parties' behavior in determining whether the insurer demonstrated bad faith, *see Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1254 (11th Cir. 2021), but an insurer is not entitled to judgment as a matter of law simply because another party's conduct was evasive or dilatory. *See,*

13

*e.g., Brink v. Direct Gen. Ins. Co.*, Case No. 8:19-cv-2844-30AEP, 2023 WL 4549545, at *4 (M.D. Fla. July 14, 2023).

Finally, Progressive's argument that the demand letter was not a true settlement offer fails because an insurer is obligated to inform its insured of "settlement opportunities," not merely of actual settlement offers. *Harvey*, 259 So. 3d at 6 (quoting *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785). Therefore, if a jury concluded that Progressive received Czaia Law's April 24 demand letter, then it could also find Progressive breached its duty of good faith by failing to advise the Sheehans of the settlement opportunity that the demand letter presented.

## III.    Progressive's Failure to Provide Information that Krasny Needed to Settle.

A reasonable jury could also conclude that Progressive's failure to provide Sheehan Sr.'s affidavit to Czaia Law demonstrated bad faith. Under Florida law, failure to timely provide a claimant with information he needs to settle his claim may give rise to a claim of bad faith against the insurer. *See Ilias*, 61 F.4th at 1347; *Harvey*, 259 So. 3d at 8–9.

For example, in *Harvey*, GEICO tendered its policy limits fewer than ten days after the accident. *Harvey*, 259 So. 3d at 4. However, GEICO failed to provide the claimant with a statement that its insured had no additional insurance coverage and that its insured was not in the scope of employment at the time of the accident. *Id.* at 4–5. Although such statements are "standard practice," GEICO never contacted its insured to secure the statement. *Id.* at 4, 9. Even after its insured learned of the request, retained independent counsel, and directed GEICO

14

to inform the claimant that it would receive the information soon, GEICO still failed to inform the claimant. *Id.* at 4–5. Because GEICO's actions caused the claimant to be "left in the dark," the claimant sued. *Ilias*, 61 F.4th at 1347 (discussing *Harvey*, 259 So. 3d at 5). As the Florida Supreme Court explained, GEICO's actions demonstrated bad faith because it failed to do "everything possible to facilitate settlement negotiations." *Harvey*, 259 So. 3d at 9. Accordingly, a directed verdict in GEICO's favor was inappropriate. *Id.*

Likewise, in *Ilias*, 61 F.4th at 1347–48, the claimant asked USAA, the insurer, to provide a sworn statement clarifying whether its insured had any additional coverage. USAA responded a month later with a disclosure describing its own policy, but the summary judgment record was disputed regarding whether USAA informed the claimant that no additional coverage existed before the claimant filed suit. *Id.* at 1348. The Eleventh Circuit held that summary judgment on this issue was inappropriate because of USAA's failure to timely respond to the claimant's request. *Id.* at 1349.

Here too, a reasonable jury could conclude that Progressive's failure to provide Krasny with information that he needed to settle his claim demonstrated bad faith. Progressive received Czaia Law's letter of representation on February 24, 2017, which notified Progressive that Czaia Law desired affidavits concerning the Sheehans' insurance and employment statuses at the time of the accident. (Doc. 41 at ¶ 6). Progressive promptly contacted the Sheehans to request that they complete their affidavits, and Sheehan Sr. did so. (*Id.* at ¶¶ 17, 19, 23, 25). Yet, after

15

Sheehan Sr. completed his affidavit, Progressive never forwarded it to Czaia Law because it believed Essentia needed to be listed on the affidavit. (*Id.* at ¶¶ 30–35, 40, 42). To be sure, Progressive may have been correct to insist that Sheehan Sr. update his affidavit, but its failure to provide Krasny with the information he needed to settle the claim may have led to the eventual lawsuit. Even once Progressive learned that Essentia would not cover the claim, Progressive still neglected to forward Sheehan Sr.'s affidavit to Czaia Law. (*Id.* at ¶¶ 37, 44). Progressive ultimately tendered the policy limits without Sheehan Sr.'s affidavit. (*Id.* at ¶ 44).

Progressive contends that Czaia Law waived its affidavit request over the phone (Doc. 30 at 9; *see* Docs. 30-4 at PRG0014 3/23/17 3:10 PM ET, 30-6 at 61:2–15), but Plaintiffs deny this (Doc. 40 at 6; *see* Docs. 32-3 at 52:9–53:21, 32-4 at 49:23–50:1; *see also* Doc. 32-1 at 55:3–12 (describing Mr. Czaia's insistence on obtaining affidavits)). Accordingly, viewing the evidence in the light most favorable to Plaintiffs, the Court must assume at this stage that Czaia Law did not waive its affidavit request. *See Cleveland*, 369 F.3d at 1192–93. Thus, a jury could reasonably conclude that Progressive breached its duty of good faith by failing to provide information that it knew Krasny needed to settle his claim, despite Progressive's knowledge that Essentia would not cover the claim and the added context that such affidavits are "standard practice." *See Harvey*, 259 So. 3d at 9.

16

**IV.    Progressive's Failure to Exercise Reasonable Care and Diligence Regarding Its Settlement Negotiations.**

Finally, a jury could conclude that Progressive breached its duty of good faith by failing to exercise reasonable care and diligence concerning its settlement negotiations once HD Law became involved.  As noted, an insurer's duty of good faith "continues through the duration of the claims process," and the insurer must "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business."  *Id.* at 6, 10 (citing and quoting *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785).  This is particularly the case where the insured faces the "ticking financial time bomb" of an excess judgment for which he is clearly liable.  *See Goheagan*, 107 So. 3d at 439.

Here, a reasonable jury could conclude that Progressive demonstrated bad faith by failing to properly handle Krasny's claim after it learned that the claim was referred to HD Law.  Progressive sent its tender package and proposed release to Czaia Law on March 23, 2017.  (Doc. 41 at ¶ 44).  After that, while Daley personally believed that the claim had been resolved (Doc. 30-6 at 159:1–2), she continued to contact Czaia Law regarding the unreturned release.  (*Id.* at ¶¶ 46–51).  She noted contacting Czaia Law at least four times over a five-month period.  (*Id.*).

On August 31, however, Czaia Law informed Daley that Krasny's claim had been referred to HD Law and that Progressive should no longer contact Czaia Law regarding it.  (*Id.* at ¶ 51).  Progressive's actions do not appear to have changed significantly in light of this development.  (*See id.* at ¶¶ 52–53).  While Daley called HD Law that same day and spoke to an employee of the firm, the record does not

17

indicate that Daley made any further effort to determine the status of the bodily injury claim until more than a month and a half after Progressive learned that the claim had been referred. (*See id.*; Doc. 30-4 at PRG0018–19). Even after Daley spoke to attorney Raymond Haas by phone on October 18, 2017, there is no indication that Progressive ever sent Mr. Haas the copies he requested or that she made any attempt to secure a signed release from Krasny. (*See* Doc. 30-4 at PRG0018–19). On this record, Progressive had no further contact with HD Law until about five months later, when Sheehan Jr. informed Progressive that Krasny had sued him. (*Id.*). Based on these circumstances, a jury could reasonably infer bad faith by Progressive because the Sheehans faced the "ticking financial time-bomb" of an excess judgment, yet Progressive did not exercise reasonable diligence and urgency to avoid that excess judgment. *See Goheagan*, 107 So. 3d at 439.

This case is distinguishable from others in which summary judgment has been granted in favor of an insurer despite the insurer's delay in handling a claim. *See, e.g.*, *Martinez*, 152 F.4th at 1326. For example, in *Martinez*, the insured was involved in a multi-vehicle accident, and the insurer waited to tender the policy limits until after a global settlement conference so that it could better investigate the many claims. *Id.* at 1326–30. The Eleventh Circuit held that the insurer's actions did not indicate bad faith because, although its delay might have been negligent, it promptly began settlement negotiations and exercised due care in resolving the competing claims to the policy limits. *Id.* at 1332–37. By contrast, here, there was only one claimant, and a reasonable jury could conclude that

18

Progressive learned of a material development concerning the claim, yet it failed to exercise reasonable care and diligence to investigate the development and continue settlement negotiations with the appropriate party.

Again, Progressive argues that its actions cannot demonstrate bad faith as matter of law because "at no time did Mr. Haas send a demand, a letter of representation, or any communication which indicated that Krasny was willing to settle for the policy limits." (Doc. 43 at 6 n.3). Florida law is clear, however, that the Court must focus on Progressive's actions, rather than those of Mr. Haas. *See Berges*, 896 So. 2d at 680. Therefore, this argument is unavailing. Under these facts, the Court cannot hold as a matter of law that the developments in Krasny's claim and the potential judgment that the Sheehans faced did not obligate Progressive to conduct a good-faith investigation into the status of its settlement negotiations. This is something for the jury to weigh.

## CONCLUSION

Progressive's Motion for Summary Judgment (Doc. 30) is **DENIED**. A final note: the Court expended substantial resources resolving this motion. Constructing the facts was difficult. Many of the arguments were conclusory. The long gaps between events left many questions looming.

All that said, the Court strongly encourages the parties to engage in robust settlement negotiations. The Court recognizes the parties will undoubtedly incur substantial costs to prepare for and engage in a jury trial. Though a considerable amount of judicial labor has already been spent in this case, the Court will

19

nonetheless offer the parties a settlement conference conducted by a randomly selected U.S. Magistrate Judge to assist them in resolving this matter at no expense to either party, should the parties represent that they desire to engage in good faith settlement negotiations.

**The parties shall have fourteen (14) days from the date of this Order to file a joint motion advising the Court of their joint decision whether a settlement conference is requested.** Should either party disagree with engaging in a settlement conference, the joint notice shall **not** indicate which party declined a settlement conference. It should generally state that the parties decline the Court's invitation to participate in a settlement conference with a U.S. Magistrate.

**ORDERED** in Tampa, Florida, on March 27, 2026.

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE

20